Leibensperger, Edward P., J.
INTRODUCTION
Were purchasers of Marlboro Lights cigarettes during the class period of 1994-1998 deceived or misled by Philip Morris USA, Inc. with respect to whether Marlboro Lights were less harmful or safer than Marlboro regular cigarettes? If so, did the purchasers suffer a cognizable injuiy as a result of the deceitful conduct that may be compensated by damages? These are the two basic questions presented by this action filed in 1998 and litigated extensively over seventeen years, culminating in a five-week trial before this court. What follows is a brief recitation of the litigation history and my findings of fact and conclusions of law after trial.
BACKGROUND
Plaintiffs filed their complaint on November 25, 1998, alleging that the conduct of Philip Morris with respect to the advertising, marketing, and sale of Marlboro Lights cigarettes was deceptive in violation of G.L.c. 93A (“c. 93A”), the Massachusetts consumer protection statute. Specifically, they claimed that Philip Morris engaged in practices prohibited by that statute “by misleading the public into believing that their product, Marlboro Lights, would deliver lower levels of tar and nicotine, when [the company] knew the truth to be otherwise and, in fact, intentionally designed the product so that most smokers of Marlboro Lights would receive as much, or more, tar and nicotine than if they had smoked regular cigarettes.” Aspinall v. Philip Morris Co., Inc., 442 Mass. 381, 382 (2004) (Aspinall 1). In 2001, a class consisting of purchasers of Marlboro Lights in Massachusetts during the four years preceding the filing of the complaint on November 25, 1998, was certified. That certification was affirmed by the Supreme Judicial Court in 2004. Id. at 402. Subsequently, in December 2005, the class definition was modified by a decision of this court (Lauriat, J.) to include “Massachusetts residents and residents of surrounding states [Connecticut, Maine, New Hampshire, New York, Rhode Island and Vermont] who regularly purchased Marlboro Lights in Massachusetts during the class period.” Aspinall v. Philip Morris Cos., Inc., 2005 Mass.Super. LEXIS 629, 20 Mass. L. Rptr. 300 (Mass.Super.Ct. 2005). The court then approved notice to the class members. The certified class is seeking recovery for economic injuries, only; not for personal injuries.
The Supreme Judicial Court addressed this case again in 2009 when it held that plaintiffs’ claims were not preempted by Federal law precluding states from requiring additional warnings about smoking and health. The Court also held that plaintiffs’ claims were not barred by §3 of c. 93A prohibiting an action based on conduct permitted by Federal law. Aspinall v. Philip Morris. Inc., 453 Mass. 431, 437 (2009) (Aspinall II).
In 2014, this court (Kaplan, J.) issued a decision regarding potential remedies available to plaintiffs. Aspinall v. Philip Morris Cos., Inc., 2014 Mass.Super. LEXIS 26, 32 Mass. L. Rptr. 75 (Mass.Super.Ct. 2014) (“Aspinall-Remedies Decision!’). The court noted the Supreme Judicial Court’s approval in Aspinall I of the following measure of actual damages: The difference between the price paid by purchasers of Marlboro Lights and the true market value of the “misrepresented’ cigarettes actually received.” As-pinall I at 399. Actual damages might possibly be doubled or trebled if the court finds that the use or employment of the unfair and deceptive acts was a willful or knowing violation of the statute. If plaintiffs are unable to prove actual damages, “they will be entitled to recover statutory damages under G.L.c. 93A, §9 (3).” Aspinall Ia.t 400. Justice Kaplan held that such statutory damages would be $25 per class member, as opposed to $25 for each purchase of Marlboro Lights. In addition, he held that plaintiffs could not recover an additional amount over actual damages or statutory damages for disgorgement of profits from Philip Morris.
In 2015, Philip Morris moved for summary judgment based on the argument that plaintiffs are not only unable to prove actual damages, but are also unable to prove any compensable injury cognizable under c. 93A. As a result, Philip Morris argued, plaintiffs may not recover even the statutory damages of $25. In a decision dated August 10, 2015, this court, by the undersigned, denied the motion. Aspinall v. Philip Morris USA, Inc., 2015 WL 9999126 (Mass.Super.Ct. 2015) [33 Mass. L. Rptr. 198] (“As-pinall-Summary Judgment Decision!’).
FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO LIABILITY I. Undisputed Facts
The parties presented certain agreed upon or stipulated statements of fact that provide background for the dispute.
Philip Morris first manufactured and sold Marlboro Lights cigarettes in 1971. It marketed, distributed and sold Marlboro Lights to its direct customers for ultimate resale to consumers purchasing cigarettes in Massachusetts and throughout the United States from 1972 through June 2010. From the introduction of the product in 1971 until the first quarter of 2003, every pack of Marlboro Lights bore the descriptors “Lights” and “Lowered Tar & Nicotine.”
In 1967, the Federal Trade Commission (“FTC”) began measuring the tar and nicotine yield of cigarettes using a standardized test method known at various times as the “Cambridge Filter Method” or the “FTC Method.” The FTC Method measured the tar and nicotine yields of cigarettes when “smoked” by a machine under standard protocols. From 1994 through 1998, Marlboro Lights and Marlboro regular cigarettes, known as “full-flavor” or “Marlboro Reds,” showed the following tar and nicotine yields when measured according to the FTC method:
*310 ‘The. Massachusetts Law Reporter Cite as 33 Mass. L. Rptr. No. 15, 310 (May 16, 2016)
[[Image here]]
After the end of the class period, in October 1999, Philip Morris included on its website a statement that “Philip Morris does not imply in its marketing, and smokers should not assume, that lower-yielding brands are ‘safe,’ or are ‘safer’ than full-flavor brands.” Beginning in late 2002 and continuing in at least one quarter every year through 2008, Philip Morris placed a threefold onsert—or pamphlet—on some packs of Marlboro Lights. The onserts were titled “Information for Smokers.” The onserts stated “You should not assume that cigarette brands using descriptors like ‘UltraLight,’ ‘Light,’ ‘Medium’ or ‘Mild’ are less harmful than ‘full flavor’ cigarette brands or that smoking such cigarette brands will help you quit smoking.” In 2009 and 2010, Philip Morris used a tear tape on all “lights” brands, including Marlboro Lights, that contained printed text informing consumers that “ ‘Lights’ does NOT mean safer.”
In the first quarter of 2003, Philip Morris removed “lowered tar and nicotine” as a descriptor from packages of Marlboro Lights, and in mid-2010, removed the “Lights” descriptor entirely. Since that time, Philip Morris continues to market and sell the cigarettes formerly known as Marlboro Lights as “Marlboro Gold." Beginning in 2011, and continuing to today, every pack of Marlboro Gold has a tear tape that reads, “Nothing about this cigarette, packaging, or color should be interpreted to mean safer.”
II. Phillip Morris Represented Marlboro Lights to Be a Less Harmful or Safer Cigarette
In 1964, the U.S. Department of Health Education and Welfare issued a landmark report entitled “Smoking and Health: Report of the Advisory Committee of the Surgeon General of the Public Health Service.” The report affirmatively linked smoking with causing lung cancer and other adverse health consequences. In the aftermath of that report, and earlier published studies going back for decades regarding the adverse health effects of smoking, Philip Morris recognized the need, in order to preserve its business, to develop and market a “healthier” cigarette. For example, in a 1966 “special project” entitled “Market Potential of a Health Cigarette” the company noted that “[i]f we could develop a medically and governmentally endorsed ‘healthy’ cigarette that tasted exactly like a Marlboro, delivered the nicotine of a Marlboro, and was called a Marlboro, it would probably become the best selling brand.” This prescient statement predicted the development and release by Philip Morris of Marlboro Lights in 1971.
Plaintiffs presented the testimony of Dr. Robert Proctor, a professor of the history of science at Stanford University. Dr. Proctor holds a Ph.D. in the history of science from Harvard University. Dr. Proctor has specialized in the history of the cigarette industry in the United States, including the design and marketing of cigarettes. He has authored and published peer-reviewed articles and books relating to the marketing and sale of cigarettes. He was a senior scientific reviewer for the 2014 Surgeon General’s report on the health consequences of smoking. He has reviewed hundreds of thousand of documents produced by the tobacco industry including interned Philip Morris documents produced in litigation. Based on those documents and his review of the scientific literature, Dr. Proctor offered opinions regarding the state of scientific knowledge in the wake of the link between smoking and cancer publicized in the 1950s and in the 1964 Surgeon General’s report and the marketing strategy undertaken by Philip Morris. I find that Dr. Proctor’s testimony aided the court in understanding and interpreting the state of scientific knowledge at various times and the importance of documents presented from Philip Morris’ internal flies. I find that he is well qualified and that his testimony was supported by the evidence.
Dr. Proctor’s testimony and the Philip Morris documents persuasively demonstrated that Marlboro Lights cigarettes were developed, designed and marketed by Philip Morris as a “health reassurance” product. Philip Morris was concerned about people quitting smoking as well as attracting new smokers in light of the “health scare.” Numerous Philip Morris documents reflect the company’s desire to develop a product for the health conscious marketplace. This motivation led to the creation of “Project Gold.”
Project Gold was the code name for what became Marlboro Lights. James Morgan was the Philip Morris executive in charge of the project. He became the brand manager for Marlboro Lights and, later, the CEO of Philip Morris. Mr. Morgan testified by way of a videotaped deposition taken in 2002. Mr. Morgan admitted that Marlboro Lights were marketed to people seeking a low tar and nicotine cigarette, including those who might want to switch to low tar from a full flavor cigarette. He conceded that at least the “majority” of people seeking a low tar and nicotine cigarette were doing so because of health concerns. Philip Morris was aware that those people believed that low tar meant less harmful. Mr. Morgan also conceded that the descriptor “Lights” conveyed to consumers, and was perceived as meaning, lower tar and, thus, less harmful. Philip Morris’ own research from as early as 1974, concluded that with respect to the lowered tar *311 and nicotine descriptor on each pack of Marlboro Lights, “[t]he ‘lowered’ line clearly means less tar . . . and better for your health . . .” Mr. Morgan acknowledged the company’s awareness of that perception. He testified that the company did nothing to counter that perception.
Other Philip Morris executives whose testimony was offered by plaintiffs through depositions confirmed that the raison d’étre of Marlboro Lights, and the aim of the continued marketing of the brand from 1971 through the class period, was to offer a cigarette perceived by smokers as less harmful than Marlboro Reds. Marlboro Lights was described as an “extension” of the Marlboro brand providing a similar flavor with the same aura projected by Marlboro Reds advertising. For example, in one advertisement Marlboro Lights was described as “the Spirit of Marlboro in a low tar cigarette.” If there had not been a desire and plan by Philip Morris to market a “light” cigarette so as to capture the market of consumers seeking a less harmful cigarette, then Marlboro Lights would likely never have come into existence. In fact, the introduction of Marlboro Lights cut into the market share of Marlboro Reds. As health conscious behavior by consumers grew, Marlboro Lights became the leading cigarette brand in the United States (in terms of market share) by the time of the class period. As described by a former vice-chairman of Philip Morris (Ross R. Millheiser), the low tar cigarette was advertised and marketed because it was perceived to be safer, and consumers would purchase it because it would be better for them. This is exactly what Philip Morris was told by its survey experts. In a 1979 study to assess the low tar market, prepared for Philip Morris by The Roper Organization, the company was told “(t]he appeal of low tars is simple and single—better for you, less harmful, easier on the lungs, throat, etc.”
Philip Morris’ intent and plan to market Marlboro Lights as a less harmful or safer cigarette is confirmed in its Strategic Plan for the period 1992-1996 (a time that includes a portion of the class period). In that document, there is a summary of the company’s knowledge and rationale for low tar and nicotine cigarettes: “An analysis of the cigarette market over the last 50 years suggests that there have been only two major influences on smokers buying patterns; namely, smokers seeking to address their perceived health concerns and smokers seeking price relief.” The document then confirms that the company’s development of the “low tar segment” was a change in design “driven by perceived health concerns.”
Dr. Proctor offered the opinion that Philip Morris’ plan was to convey “safety” "with the descriptors “Lights” and “Lowered Tar & Nicotine” on each pack of Marlboro Lights. I agree based upon the Philip Morris documents and the testimony of its executives. My finding is that Philip Morris, intentionally, knowingly and willfully, conveyed through the use of the descriptors for more than thirty years that Marlboro Lights cigarettes were less harmful, and therefore safer, than Marlboro Reds and other full flavor cigarettes.
III. The Representation by Philip Morris That Marlboro Lights Was Less Harmful or Safer Than Marlboro Reds Was Material to Purchasers’ Decisions to Buy Marlboro Lights During the Class Period
The logical inference from the success of the Philip Morris strategy to develop and market Marlboro Lights is that the “less harmful” representation by the company was material to the decision to buy Marlboro Lights. If consumers were not motivated by the promise of a “less harmful” cigarette, it is reasonable to conclude that they would have continued to buy Marlboro Reds. Marlboro Lights would not have overtaken Marlboro Reds as the leading brand.
Whether the purchaser was originally a Marlboro Reds smoker, a smoker who was trying to quit by reducing his or her intake of nicotine, or a new smoker, his or her reasonable choice was to purchase a less harmful cigarette that delivered a similar taste and conveyed a similar image as Marlboro Reds. That is what Philip Morris expected and that is what the market research contracted for by Philip Morris confirmed, including research conducted during the class period. Based on the reported research, Dr. Proctor concluded that “a lot of people who might otherwise have quit” shifted to a cigarette they thought was safer because it was lower in tar and that “people bought the myth [that Marlboro Lights cigarettes were less harmful], acted on it, and Marlboro Lights becomes the best selling cigarette in the countiy as a result of these descriptors.”
At trial, Philip Morris attempted to rebut the conclusion that the “less harmful” message was material to consumers’ choices to buy Marlboro Lights by introducing into evidence various articles, news reports and public service advertisements (the “reports”) going back to the 1930s, and increasing in intensity in the 1980s and 1990s. The gist of the reports was that cigarettes lower in tar and nicotine may not be better for you because the smoker will compensate; i.e., puff harder and longer, inhale deeper and smoke more cigarettes to obtain the level of tar and nicotine the smoker desires. Philip Morris offered this evidence, at least in part, to suggest that plaintiffs in the class period could not have bought Marlboro Lights on the premise that the cigarettes were less harmful.
This attempt at rebuttal is unpersuasive and counter-productive to Philip Morris.[2] Isolated reports in journals and magazines, and even news reports and public service announcements about the phenomenon of compensation, hardly overcomes the implied message of “less harmful” that was featured on every pack of Marlboro Lights. Dr. Proctor testified that the public health community and the public in general did not have sufficient information, including information *312 from the files of Philip Morris, to understand the depth, and completeness, of compensation until 2001. According to Dr. Proctor, the “sales of Lights showed the continuing misunderstanding [of Marlboro Lights being less harmful].” Even Philip Morris’ CEO during most of the class period, Mr. Morgan, acknowledged that it was “very unlikely that consumers, or at least the vast majority of consumers” would know about the phenomena of compensation. I find that a reasonable, objective consumer would continue, throughout the class period, to view the health reassurance message conveyed on each pack of Marlboro Lights as a material factor in choosing to buy Marlboro Lights.
IV. Philip Morris Knew That Marlboro Lights Cigarettes Were Just As Harmful, if Not Potentially More Harmful, to Smokers Than Marlboro Reds A. Philip Morris Knew That People Smoke to Get Nicotine and Compensate to Satisfy Their Need for Nicotine by Adapting Their Smoking Behavior
Philip Morris knew that nicotine is addictive. In contrast to its public denial of the addictive nature of nicotine, an internal document from 1963 acknowledged that “nicotine is addictive” and stated “we are, then, in the business of selling nicotine, an addictive drug effective in the release of stress mechanisms.” The company’s research confirmed that “the primary motivation for smoking is to obtain the pharmacological effect of nicotine.” A Philip Morris document from 1972 noted that the “psychological response to nicotine can readily be elicited by cigarettes delivering in the range of 1 mg. of nicotine” and that attempts to introduce low nicotine brands into the market were not successful in capturing a substantial segment of the market.
Dr. Peter Shields was called as an expert witness for plaintiffs. Dr. Shields is a medical doctor specializing in lung cancer research and treatment. He has concentrated his career on the connection between smoking and lung cancer, has published more than 200 articles in peer-reviewed journals and has been employed by, and then served as an advisor to, the National Cancer Institute. I find that Dr. Shields is a highly qualified expert witness whose testimony was credible and persuasive.
Dr. Shields explained that individual smokers, whether long-time smokers or new smokers, develop a “nicotine thermostat.” The thermostat measures their internal need to obtain the benefits of nicotine such as elevation of mood, relaxation, suppression of appetite, etc. A smoker will smoke to obtain the level of nicotine necessary to obtain his or her satisfaction on the nicotine thermostat. The smoker will do so largely in a subconscious manner. If presented with a cigarette that does not deliver nicotine in an amount to satisfy the smoker’s nicotine thermostat, the smoker subconsciously compensates by taking deeper puffs, holding the smoke longer, smoking the cigarette closer to the butt, or smoking more cigarettes. This behavior, known as compensation or titration, was well known to Philip Morris as evidenced by numerous documents in the company’s files.
Philip Morris internal documents from the 1970s recognize that “smokers develop a daily nicotine quota for tar and nicotine” and will change “the duration and volume of their puffs” to reach the quota. “The smoker is going to get the amount of tar he wants regardless of how many he smokes and regardless of the tar delivery of the cigarette ... It may well be that the Marlboro smoker today gets as much from his cigarette as the Philip Morris non-filter smoker got 20 years ago by puffing and inhaling more efficiently so that a greater proportion of that made available to him is gotten over into his system.”
It is on the basis of Philip Morris’ knowledge of the addictive nature of nicotine and the phenomenon of smoker compensation that Philip Morris’ design of Marlboro Lights must be evaluated.
B. Philip Morris Designed Marlboro Lights Knowing That the Design Allowed If Not Encouraged a Smoker to Obtain the Same Tar and Nicotine As Marlboro Reds
Dr. William Farone, a high-level Philip Morris employee from 1976 to 1984, testified for plaintiffs, both live and by deposition transcript. Dr. Farone was the Director of Applied Research at Philip Morris. He was involved in the design of Philip Morris cigarettes and, in that capacity, attended weekly meetings with the top executives of the company. His testimony was credible and was buttressed by internal Philip Morris documents.
According to Dr. Farone, Philip Morris wanted to take competitive advantage of the health scare precipitated by the 1964 Sturgeon General’s report. He referenced the 1966 Philip Morris document entitled “Market Potential of a Health Cigarette,” which stated that (1) a large proportion of smokers are concerned about the relationship of cigarette smoking to health; (2) mere reduction in nicotine and TPM [total particulate matter] delivery by conventional methods of filtration would not be a sufficient basis for launching a new cigarette, and to attempt it would be to court disaster; and (3) “the illusion of filtration is as important as the fact of filtration.” Dr. Farone testified that the Marlboro Lights design was consistent with providing only the illusion of filtration.
Philip Morris developed a cigarette that would be perceived as less harmful or safer than its Marlboro Reds brand because of the design of the filter. Specifically, the principal difference between Marlboro Reds and Marlboro Lights was the design of the filter, with Marlboro Lights using tiny, virtually undetectable, ventilation holes in the filter. After 1978, when Marlboro Reds also began utilizing ventilation holes, the principal difference in design between Marlboro Lights *313 and Marlboro Reds was that Marlboro Lights ventilation holes provided about ten percent more ventilation when measured on a smoking machine. According to Dr. Farone, Philip Morris knew that this relatively small difference in ventilation as measured on a smoking machine ensured that a smoker could and would receive the same amount of tar and nicotine from a Marlboro Lights cigarette as a Marlboro Reds cigarette because of the smoker’s unconscious compensation methods.
Marlboro Lights was designed so that when the smoke yield of tar and nicotine was measured on a standardized smoking machine, the yield would be lower in tar and nicotine than the yield of Marlboro Reds. At the same time, Philip Morris knew that people do not smoke like the standardized smoking machine. Philip Morris’ Director of Research (Dr. Wakeham) admitted in a 1974 document that “people do not smoke like a machine.” In another internal Philip Morris memorandum it is stated flatly that the machine yield data are “erroneous and misleading” as to the actual receipt of tar and nicotine by the smoker.
Dr. Farone’s testimony regarding the design of Marlboro Lights was unrebutted. He testified that there are more than fifty design features of a cigarette that can affect the amount of the delivery of tar and nicotine. Philip Morris wanted Marlboro Lights to taste like Marlboro Reds (taste is a function of the amount of tar delivered) and to deliver nicotine that would satisfy a smoker like a Marlboro Reds would. Thus, Philip Morris elected to design Marlboro Lights so the cigarette would deliver lower yields of tar and nicotine on the smoking machine but would allow a smoker easily to obtain the same yield of tar and nicotine as Marlboro Reds. While it was possible, according to Dr. Farone, to design a cigarette with sufficient filtration or ventilation to make it impossible for a smoker, by use of compensation methods, to draw equivalent levels of tar and nicotine as from Marlboro Reds, Philip Morris designed Marlboro Lights to deliver a small reduction in tar and nicotine as measured by the machine in order to ensure the smoker could easily overcome the reduction and be satisfied by the taste of the cigarette and the intake of nicotine as if he smoked Marlboro Reds. As testified to by Dr. Farone, Marlboro Lights cigarettes were designed to give the smoker the “opportunity with a slight increase in puff to obtain the same amount of nicotine that one obtained from a Marlboro Red.” Also, the ventilation holes in the filter made it easy for a smoker to compensate by simply covering the holes with his fingers or lips. Philip Morris knew that such behavior by a smoker would mitigate any alleged lower delivery of tar and nicotine. Dr. Farone, who was involved with the decision about where to place the ventilation holes, denied that Philip Morris intended to place the holes strategically to ensure the smoker would cover them by lips or fingers. The choice of using ventilation holes, as opposed to other methods of filtration, was made, however, knowing that smokers would consciously or unconsciously, block the ventilation by covering the holes.
In sum, based upon Dr. Farone’s testimony and the documents from the internal files of Philip Morris, I find that Philip Morris knew that the difference in design between Marlboro Lights and Marlboro Reds would not result in the delivery of lower tar and nicotine to a human smoker, as opposed to a smoking machine. As Dr. Farone testified, he and the other executives at Philip Morris with whom he interacted were fully aware that the design difference between the two brands was not enough “to make any significant— statistically significant or meaningful difference in the amount of tar and nicotine that a person actually [received] from those two cigarettes.” Nevertheless, Philip Morris continued to market and advertise Marlboro Lights as “Lowered Tar & Nicotine” without disclosing or explaining that such a claim was meaningless as it related to how a human actually smokes the cigarette.
C. By the Start of the Class Period, Philip Morris Was Aware of Scientific Evidence Showing That There Was No Statistically Significant Difference Between the Amount of Tar and Nicotine Received By Smokers of Marlboro Lights as Compared to Marlboro Reds
Dr. Shields testified regarding the internal studies at Philip Morris and the state of scientific literature available to Philip Morris prior to and throughout the class period. The scientific evidence consistently demonstrated, and supported Dr. Shields’ opinion, that smokers did not receive a statistically significant reduction in tar and nicotine from Marlboro Lights as opposed to Marlboro Reds. I accept Dr. Shields’ testimony as credible and persuasive.
In the 1970s, Philip Morris developed a Human Simulator Program to test whether human smokers actually received less tar and nicotine from a “light” cigarette. According to Dr. Shields, more than twenty studies were conducted by Philip Morris before 1983. In a 1975 study specifically comparing the tar and nicotine delivered by Marlboro Lights and Marlboro Reds, the Philip Morris researchers found that Marlboro Reds “smokers in this study did not achieve any reduction in smoke intake by smoking a cigarette (Marlboro Lights) normally considered lower in delivery.” Dr. Shields testified that other studies performed by Philip Morris produced similar and consistent conclusions. Philip Morris’ contention at trial that the 1978 design changes to Marlboro Lights and Marlboro Reds might make the early 1970s studies irrelevant was rejected, persuasively, by Dr. Shields. The post-1978 design of the two cigarettes presented the same results because the primary difference between the two cigarettes was and is ventilation. Philip Morris did not offer any credible rebuttal to this testimony.
*314 In 1983, a paper appeared in the New England Journal of Medicine by a Dr. Benowitz. Dr. Shields testified that the publication of this article created a “big splash” in the scientific community and in the news directed to the general public. According to Dr. Shields, the Benowitz article provided clear notice to Philip Morris that smokers of lower tar cigarettes were not getting lower exposure to tar and nicotine.
It was Dr. Shield’s opinion, based upon the scientific literature, Philip Morris documents and his professional background, that because the design of Marlboro Lights and Marlboro Reds was so similar, there would be one hundred percent compensation among the vast majority of smokers of Marlboro Lights to obtain the same intake of tar and nicotine as from Marlboro Reds. As a result, Marlboro Lights was not a lower risk tobacco product and Philip Morris knew it.
Considerable time was spent at trial analyzing published scientific studies addressing whether light cigarettes deliver lower tar and nicotine to the smoker under various assumptions and protocols. The studies discussed included ones done before and after the class period, including two principal ones carried out by Philip Morris long after the class period. Dr. Shields testified that all of the studies consistently support his opinion that, as between Marlboro Lights and Marlboro Reds, there is no statistically significant difference in exposure to tar and nicotine to the smokers of the two brands. In contrast, an expert called by Philip Morris, Dr. Peter Valberg, opined that the studies done after the class period demonstrated that smokers of Marlboro Lights actually received lower tar and nicotine. Dr. Valberg’s analysis of the data provided by the published studies was shown to be inconsistent and contrary to the consensus of the scientific community. Dr. Valberg’s analysis has never been published or subjected to peer review. I find that the testimony of Dr. Shields was far more persuasive and credible than the testimony of Dr. Valberg.
Finally, plaintiffs called as an expert witness, Dr. David M. Burns. Dr. Burns, a medical doctor, served as the senior scientific editor of Monograph 13 published by the National Cancer Institute in 2001. Monograph 13 is entitled “Risks Associated With Smoking Cigarettes With Low Machine-Measured Yields of Tar and Nicotine.” Dr. Burns testified that the conclusions stated in Monograph 13 were subject to extensive peer review and represented the consensus of the scientific and public health communities. In Monograph 13, the National Cancer Institute concluded as follows:
The combination of these two phenomena—compensation on the part of the smoker and elasticity of delivery in the cigarette—meant that most, perhaps nearly all, smokers who switched to these low-yield brands did not substantially alter their exposure to tar and nicotine and, correspondingly, did not lower their risk.
Monograph 13 at p. 3. Further, the Monograph reported that “[cjonsidering the overall exposure data for individuals selecting their own brands, there is little reason to expect that smokers of low-yield cigarettes will have a lower risk of disease than those who smoke higher yield cigarettes.” Monograph 13 at p. 60. Dr. Burns expressed the same opinions in his testimony and I find that his opinions are persuasive.
D. Philip Morris Did Not Substantiate the Representation That Marlboro Lights Are Less Harmful or Safer
For approximately twenty-three years leading up to the start of the class period in this action (1994), Philip Morris advertised and sold Marlboro Lights as a cigarette that was less harmful or safer than Marlboro Reds. Yet when Michael Szymanczyk, the CEO of Philip Morris in 1997, was asked in a deposition taken on February 11, 2003, whether there was any basis for that representation he readily conceded that “it has not been proven that Lights are safer.” Other Philip Morris executives echoed the lack of any scientific foundation for the health reassurance message conveyed by the descriptors on each pack of Marlboro Lights. Dr. A.C. Lilly, the Vice-President of Technology at Philip Morris, testified in a deposition on July 31, 2001, as the Philip Morris designee on the design of Marlboro Lights. He admitted that he never saw any scientific evidence to support a statement that Marlboro Lights were safer than Marlboro Reds. Dr. Jerry Whidby, the highest ranking scientist within Philip Morris in 1998, testified in a deposition on May 21, 2002, that Philip Morris conducted no biological testing of the finished products, Marlboro Lights and Marlboro Reds, so as to compare any differences. The company, thus, had no way to compare the two brands with respect to smokers’ biological results from inhaling the smoke.
In 2008, ten years after the close of the class period, Philip Morris published a study entitled “A Randomized, Controlled Exposure Study in Adult Smokers of Full Flavor Marlboro Cigarettes Switching to Marlboro Lights or Marlboro Ultra Lights Cigarettes.” In this paper, Philip Morris admitted that “to date no state-of-the-art clinical study has been conducted to address the question as to whether switching to lower tar cigarettes reduces exposure to smoke constituents in humans.”[3] No explanation was offered by Philip Morris as to why, as a manufacturer of a product to be sold to the public, it had not conducted this study at an earlier time to justify its implicit “less harmful” message communicated for the entire time Marlboro Lights cigarettes were on the market.
I find that Philip Morris, for more than twenty-eight years until 1999, knowingly and willfully marketed Marlboro Lights as a cigarette less harmful or safer than Marlboro Reds without sufficient evidence to substantiate that claim. This was, in essence, acknowledged by Philip Morris when in 1999, Philip *315 Morris stated on its website, for the first time, that consumers should not assume that lowered tar and nicotine cigarettes are safer than full flavor brands. Finally, in 2003, Philip Morris removed the “Lowered Tar & Nicotine” descriptor from the package of Marlboro Lights, and in 2010, removed the “Lights” descriptor entirely. Philip Morris did not explain at trial what it learned in 1999 and 2003 that was different from what it knew throughout the class period.
In 2014, the Surgeon General of the United States issued a report entitled “The Health Consequences of Smoking—50 Years of Progress.” Among the findings in that report are the following regarding ventilated filters such as those on Marlboro Lights:
The evidence is sufficient to conclude that the increased risk of adenocarcinoma of the lung in smokers results from changes in the design and composition of cigarettes since the 1950s . . . The evidence is not sufficient to specify which design changes are responsible for the increased risk of adenocarcinoma, but there is suggestive evidence that ventilated filters and increased levels of tobacco-specific nitrosamines have played a role.
Plaintiffs’ expert witnesses, Dr. Shields and Dr. David Burns, testified that the above statement in the 2014 Surgeon General’s report constitutes the consensus view of the scientific community. Each witness testified that, in his opinion, applying a “more likely than not” evidentiary standard, Marlboro Lights are, in fact, more harmful to smokers than Marlboro Reds because of the data suggesting increased adenocarci-noma in smokers of highly ventilated cigarettes. The witnesses explained that the increased ventilation of Marlboro Lights causes tobacco to burn more slowly which results in the delivery of more tobacco specific nitrosamines to the smoker than a lesser ventilated cigarette. The tobacco specific nitrosamines are mu-tagenic; i.e., they cause mutations in the cells of smokers. Some of those mutations may become carcinogenic. Specifically, the mutagens can cause cancer, particularly lung cancer of the adenocarcinoma variety. According to Dr. Shields, the 2014 Surgeon General’s report is based upon more than forty years of scientific research on the subject of mutagenicity.
Philip Morris contests the conclusion that Marlboro Lights are more dangerous than Marlboro Reds. It argues that the 2014 Surgeon General’s report (1) does not represent a consensus of the scientific community, (2) does not support the “more likely than not” opinion of plaintiffs’ experts, and (3) there is insufficient evidence to support the conclusion of increased mutage-nicity from highly ventilated cigarettes.
For purposes of this case, it is unnecessary to reach a conclusion as to whether Marlboro Lights cigarettes are more dangerous than Marlboro Reds. It is enough to find, as I do, that for decades a substantial scientific question was raised in the scientific and public health communities, and was known to Philip Morris, concerning the use of ventilated filters causing the smoke to be more mutagenic. Dr. Shields testified, with reference to numerous documents from the files of Philip Morris, that Philip Morris was aware from in vitro testing and other studies that cigarettes with increased ventilation, like Marlboro Lights, appeared to be higher in specific mutagenicify than those with lesser ventilation, like Marlboro Reds. According to Dr. Shields, the results of those studies regarding increased mutagenicity should have been a “red flag” to Philip Morris to conduct further research. Yet Philip Morris not only failed prior to the class period to conduct sufficient biological research or to conduct epidemiological studies to determine whether the increase in specific mutagenicity made Marlboro Lights more dangerous, but also continued to market and advertise Marlboro Lights as a less harmful or safer cigarette than Marlboro Reds without evidentiary substantiation of that claim. Moreover, every purchaser of Marlboro Lights was deprived of material information when they purchased a pack of cigarettes regarding the potential effect of Marlboro Lights being more mutagenic than Marlboro Reds.
V. Philip Morris Deceived and Misled Consumers During the Class Period in Violation of c. 93A A. The Continued Use in the Class Period by Philip Morris of the Descriptors on Each Pack of Marlboro Lights Was Deceptive and Misleading in Violation of c. 93A
The Massachusetts consumer protection statute, c. 93A, §2(a), provides that “[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.”[4] A party alleging a violation of c. 93A must establish (1) an unfair or deceptive act or practice under c. 93A, §2, (2) an injury, and (3) a causal connection between the injury and the defendant’s unfair or deceptive act. Hershenow v. Enterprise Rent-A-Car Co. of Boston, Inc., 445 Mass. 790, 797 (2006). “A successful G.L.c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation ... or that the defendant intended to deceive the plaintiff... or even knowledge on the part of the defendant that the representation was false.” Aspinall I at 394.
A practice is “deceptive,” for purposes of c. 93A, if the conduct could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted. Id. (noting that “whether conduct is deceptive is initially a question of fact, to be answered on an objective basis . . .”). Moreover, conduct is deceptive if it has “a tendency to deceive.” Id. “In determining whether an act or practice is deceptive, ‘regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which [the act or practice] might reasonably be expected to have upon the general *316 public.’ ” LeardLi v. Brown, 394 Mass. 151, 156 (1985), quoting P. Lorillard Co. v. Federal Trade Comm’n, 186 F.2d 52, 58 (4th Cir. 1950).
The Supreme Judicial Court previously addressed legal standards specifically relating to false advertising and c. 93A that are applicable to the instant case. See Aspinall I at 394-98 (noting that “[i]f as alleged, the defendants intentionally labeled their cigarettes ‘Lights’ with ‘lowered tar and nicotine’ in order to establish in the individual and collective consumer consciousness the concept that Marlboro Lights are more healthful (or, at least, less unhealthful) to smoke than regular cigarettes, and thereby increase the defendants’ market share of cigarette sales, with full knowledge that most Marlboro Lights smokers would not in fact receive the promised benefits of‘lowered tar and nicotine,’ then there can be no question that the sales of Marlboro Lights occurred in circumstances that make the sales deceptive under G.L.c. 93A”). Under Massachusetts law, “advertising need not be totally false in order to be deemed deceptive in the context of G.L.c. 93A.” Aspinalll at 394. “The criticized advertising may consist of a half truth, or even may be true as a literal matter, but still create an over-all misleading impression through failure to disclose material information.” Aspinall I at 395, citing Urman v. South Boston Sav. Bank, 424 Mass. 165, 168 (1997); Underwood v. Risman, 414 Mass. 96, 99-100 (1993); Greenery Rehabilitation Group, Inc. u. Antaramian, 36 Mass.App.Ct. 73, 78 (1994) (“One can violate §2 of G.L.c. 93A ... by failing to disclose to a buyer a fact that might have influenced the buyer to refrain from the purchase”). In essence, “an advertisement is deceptive when it has the capacity to mislead consumers, acting reasonably under the circumstances, to act differently from the way they otherwise would have acted (i.e., to entice a reasonable consumer to purchase the product).” Aspinall [at 396 See Bellermann v. Fitchburg Gas & Electric Light Co., 470 Mass. 43, 54 n.10 (2014) (“Where a defendant’s unfair or deceptive conduct causes customers to receive a product or service worth less than the one for which the customers paid, the customers may pursue a class action under G.L.c. 93A to recover the amount by which they overpaid”).
In addition, the Massachusetts Attorney General has promulgated interpretive regulations pursuant to c. 93A, §2(c) that are applicable to this court’s determination of whether Philip Morris violated c. 93A. Purity Supreme, Inc. v. Attorney Gen., 380 Mass. 762, 769-71 (1980) (recognizing that regulations authorized by G.L.c. 93A, §2(c) have the force of law, and “set standards the violations of which . . . constitute violations of c. 93A”).
Title 940 Code Mass.Regs. §6.04(1) provides: “It is an unfair or deceptive act for a seller to make any material representation of fact in an advertisement[5] if the seller knows or should know that the material representation is false or misleading or has the tendency or capacity to be misleading, or if the seller does not have sufficient information upon which a reasonable belief in the truth of the material representation could be based.” Specifically, a seller must be able to substantiate material representations about the product, as required by §6.03(1) of the regulations. (“The responsibility for truthful and nondeceptive advertising rests with the seller. Sellers must be able to substantiate material representations made before such representations are disseminated.”)
Furthermore, 940 Code Mass.Regs. §3.05(1) states; “No claim or representation shall be made by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect.” This prohibition includes, but is not limited to, representations or claims relating to the safety of a product. As mandated by 940 Code Mass.Regs. §3.16(2), if “(a]ny person or other legal entity subject to this act fails to disclose to a buyer or prospective buyer any fact, the disclosure of which may have influenced the buyer or prospective buyer not to enter into the transaction” there has been a violation of c. 93A.
Whether the labeling and advertising of Marlboro Lights by Philip Morris was deceptive or misleading “is initially a question of fact, to be answered on an objective basis and not by the subjective measure argued by the defendants.” Aspinall I at 394. Thus, I evaluate whether the use by Philip Morris of the descriptors on each pack of Marlboro Lights had the tendency or capacity to deceive a consumer as to whether Marlboro Lights were less harmful or safer than Marlboro Reds and whether a reasonable consumer of cigarettes in Massachusetts during the class period could have been deceived or misled by the Marlboro Lights package, distinguishing itself from Marlboro Reds by touting “Lowered Tar & Nicotine” and “Lights.”
Applying these legal standards to the findings of fact described above, I find that plaintiffs have proven unlawful conduct by Philip Morris. Philip Morris knew that the implicit health reassurance message (Marlboro Lights are less harmful or safer than Marlboro Reds) conveyed by the descriptors “Lowered Tar & Nicotine” and “Lights” was not justified. The company did not conduct scientific research in the period of time through the class period to substantiate the implicit claim of “less harmful” or “safer” than Marlboro Reds. Moreover, the company knew that the representation of lowered tar and nicotine was not true for the vast majority of smokers because smokers become addicted to nicotine and compensate in their smoking methods to obtain a level of tar and nicotine that will be the same or greater than a full flavor cigarette like Marlboro Reds. In fact, the company designed Marl *317 boro Lights to be so close to the design of Marlboro Reds (including the quantity of nicotine delivered) that a modicum of compensation could easily overcome the design of Marlboro Lights that produced lowered tar and nicotine yields on the smoking machine. Despite this knowledge, Philip Morris, nevertheless, elected not to inform consumers of the material facts regarding the phenomenon of compensation until 1999 and later.
Moreover, as described above at pp. 9-10,1 find that the health reassurance message conveyed on Marlboro Lights packages was material to the decision of a reasonable consumer to buy the product. Plaintiffs were not required to prove reliance on the misrepresentations by any particular class member or account for the potential variations among individual class members in the manner in which they might have weighed the health reassurance message. Instead, I find that the implied misrepresentation of “less harmful” and “safer” may “reasonably be expected” to deceive “the general public.” Aspinall I at 394. It is “self-evident” that a representation regarding the health and safety of a product is material to the reasonable consumer’s decision to purchase. Commonwealth v. AmCan Enterprises, Inc., 47 Mass.App.Ct. 330, 336 (1999) (recognizing that court may make such a determination as a matter of law). See also, In the Matter of Novartis Corp., 127 F.T.C. 580, 686 (1999), affd 223 F.3d 783, 787 [D.C.Cir. 2000) (“Certain categories of information are presumptively material, including, but not limited to, express claims, claims significantly involving health or safety, and claims pertaining to the central characteristic of the product”). “Neither an individual’s smoking habits nor his or her subjective motivation in purchasing Marlboro Lights bears on the issue whether the advertising was deceptive.” Aspinall I at 397.
Finally, I find that the use by Philip Morris of the descriptors was known by Philip Morris to be a deceptive and false health reassurance message and yet was willfully continued by Philip Morris as a deceptive practice throughout the class period. The deception was both because of what the descriptors explicitly stated and because of Philip Morris’ failure to explain or qualify the health reassurance message. In addition, the deception was perpetrated by conveying a health reassurance message when the company did not have evidence to substantiate that claim.
B. The Plaintiff Class Was Injured as a Result of the Deceptive Conduct of Philip Morris
A plaintiff prosecuting an action for damages under c. 93A must prove that he or she “has, as a result, suffered a distinct injury or harm that arises from the claimed unfair or deceptive act itself.” Tyler v. Michaels Stores, Inc., 464 Mass. 492, 503 (2013). In other words, “the violation of the legal right that has created the unfair or deceptive act or practice must cause the consumer some kind of separate, identifiable harm arising from the violation itself.” Id.
Philip Morris moved for summary judgment immediately before trial arguing that plaintiffs would be unable to prove the requisite “injury” to allow recovery under c. 93A. Philip Morris contended that the injury requirement had been refined by the Supreme Judicial Court since Aspinall I such that plaintiffs claims are now precluded. Philip Morris advances the argument even though the Supreme Judicial Court held in As-pinall I that if deceptive advertising is proved “a per se injury on consumers who purchased the cigarettes represented to be lower in tar and nicotine” has occurred. Aspinall I at 402. The Court went further to say that “all will be entitled to statutory damages, without regard to whether the plaintiffs are successful in establishing that consumers were overcharged for the deceptively advertised cigarettes.” Id.
I denied Philip Morris’ motion for summary judgment in a decision dated August 10, 2015. Aspinall— Summary Judgment Decision, 2015 WL 9999126 at *4 [33 Mass. L. Rptr. 198). I noted the decision of the Court in Bellermann, supra, among other cases. Citing Aspinall as good authority, the Court in Bellermann stated “[wjhere a defendant’s unfair or deceptive conduct causes customers to receive a product or service worth less than the one for which the customers paid, the customers may pursue a class action under G.L.c. 93A to recover the amount by which they overpaid.” Bellermann, 470 Mass. at 54, n.10. Bellermann also cited as good authority Iannacchino v. Ford Motor Co., 451 Mass. 623, 630 (2008), where the Court rejected an argument that Hershenow, supra, barred recovery under c. 93A. A claim by plaintiffs in Iannacchino that the cars they purchased were less safe than was represented or required by safely standards “would support a cause of action under G.L.c. 93A, §9.” Iannacchino, 451 Mass. at 630.
I concluded that if plaintiffs could prove that the Marlboro Lights cigarettes sold to the plaintiff class were less safe than represented to purchasers, plaintiffs would have suffered a separate, identifiable harm arising directly from the deceptive acts of Philip Morris. That is because a less safe cigarette is inherently lower in value than a safe cigarette. Regardless of the price set by Philip Morris for Marlboro Lights and Marlboro Reds, “[l]ogic . . . suggests that all other things being equal, a truly low tar and nicotine cigarette would have economic worth greater than a comparable regular cigarette, due to the added value of an inherently ‘safer’ cigarette.” Aspinall I at 400. As stated in my decision on summary judgment, “[a] claim that the product purchased was less safe than the product advertised is exactly what is asserted by plaintiffs here. If proved, plaintiffs have suffered a separate, identifiable harm arising directly from the alleged unfair or deceptive acts. That the less safe product actually received has a true market value less than the *318 product as advertised is a reasonable inference.” As-pinall—Summary Judgment Decision, supra at *4.
I find that the Marlboro Lights cigarettes sold during the class period were less safe to the smoker than the Marlboro Lights reasonable purchasers thought they were purchasing. I find that a diminution in value is a common sense inference.[6] If a consumer were offered two products, (1) Marlboro Lights represented to be less harmful and safer than Marlboro Reds and (2) Marlboro Lights represented to be just as harmful or potentially more harmful than Marlboro Reds, the consumer would buy the second product only at a reduced price, thereby reflecting its true market value.[7]This reasonable inference is not affected by the fact that Philip Morris sold Marlboro Lights and Marlboro Reds at the same price.[8] The appropriate measure is the difference between the two versions of Marlboro Lights, not any potential difference between the market value of Marlboro Lights versus Marlboro Reds. See Aspinall I at 399-400. In addition, the reasonable inference of a diminished value of fully disclosed Marlboro Lights is not affected by individual characteristics among class members. Regardless of a class member’s subjective understanding of the Philip Morris health reassurance message or, whether because of his or her individual smoking behavior he or she received lowered tar and nicotine, the class member paid more for Marlboro Lights than what he or she would have paid in a true market if the relative health risks of Marlboro Lights had been fully disclosed.[9] Consequently, all members of the class suffered a similar injury—they purchased a product that had less true market value than what was represented. Accordingly, I find that plaintiffs, as a class, suffered a similar injury that is compensable under c. 93A. As a result, Philip Morris’ post-trial Motion to Decertify the Class (Paper #210) will be denied.
FINDINGS OF FACT AND CONCLUSIONS OF LAW AS TO DAMAGES
In Aspinall I, the Supreme Judicial Court approved the following measure of actual damages in this case:
The plaintiffs expect to offer proof at trial that the amount all purchasers of Marlboro Lights paid for the cigarettes exceeded their true market value (what purchasers would have paid had they known the truth). If they succeed in their proof, the plaintiffs argue that the correct model for measuring actual damages is the difference between the price paid by the consumers and the true market value of the “misrepresent[ed]” cigarettes they actually received. (Thus, the exact amount of actual damages may be determined by multiplying the number of cigarettes sold, in the years defined by the certification order, by the difference between the price paid and actual fair market value.) This is a variation of the traditional “benefit of the bargain” rule that awards a defrauded party the monetary difference between the actual value of the product at the time of the purchase and what its value would have been if the misrepresentations had been true. We agree that the “benefit of the bargain” damages, if proved with reasonable certainty, would be appropriate in this case.
Aspinall I at 399. This measure of damages requires in the circumstances of this case that plaintiffs prove the true market value of a hypothetical product during the class period; namely, a Marlboro Lights cigarette that was sold and marketed as a product just as harmful as Marlboro Reds, and perhaps even potentially more harmful than Marlboro Reds. For purposes of clarity in discussing the measurement of damages, the Marlboro Lights as sold by Philip Morris during the class period (the cigarettes sold as less harmful or safer than Marlboro Reds) will be called Product 1. The hypothetical version of Marlboro Lights (the cigarettes with full disclosure as just as harmful or perhaps more harmful than Marlboro Reds) will be called Product 2. Plaintiffs’ burden is to prove the difference in true market value between Product 1 and Product 2.
I. Proof of Actual Damages
Plaintiffs attempted to meet their burden of proof through the testimony of two expert witnesses: Dr. Michael Dennis and Dr. Jeffrey E. Harris. Both witnesses hold doctorate degrees (political science and economics, respectively) and have published extensively in peer reviewed journals. Dr. Dennis has more than twenty years of experience in the field of survey research. Dr. Harris, who also holds a doctor of medicine degree, is a professor in the economics department at MIT and teaches both economics and statistics. By virtue of their education, background and experience, I find that both witnesses are qualified to give the opinions they provided in this litigation.
Based on the results of a nationwide survey conducted by Dr. Dennis in November 2002, Dr. Harris opined on the difference in true market value between Product 1 and Product 2. Dr. Harris performed calculations using a contingent valuation methodology. The methodology attempts to measure a consumer’s willingness to pay for the hypothetical Product 2. That willingness to pay is calculated as a percentage discount from the price actually paid for Product 1. Dr. Harris opined that consumers would value Product 2 at 22.3% of the Product 1 price if Product 2 were disclosed as “just as harmful” as Marlboro Reds. Consumers would value Product 2 at 7.7% of the Product 1 price if Product 2 were disclosed as “could be more harmful” than Marlboro Reds. Dr. Harris then calculated the amount overpaid by the class members as the discount between what the consumers paid and what they would have paid had full disclosure occurred (100% - 22.3% = 77.7% discount and 100% - 7.7% = 92.3% discount, respectively). Applying those percentages to the total amount actually paid for Marlboro Lights (Product 1) by class members during the class period ($660.1 million),[10] Dr. Harris arrived *319 at the amount, in his opinion, that represents the difference in true market value between Product 1 and Product 2 during the class period. The amount is $512.9 million if Product 2 were disclosed as “just as harmful” as Marlboro Reds ($660.1 million x .777). The amount is $609.3 million if Product 2 were disclosed as “could be more harmful” than Marlboro Reds ($660.1 million x .923). Plaintiffs seek an award of actual damages in the amount of one of those two numbers.
I find that plaintiffs’ proof of actual damages is unpersuasive and inadequate. Moreover, the proof is based upon serious flaws in methodology and assumptions. Before getting into specifics, I ask whether the numbers alleged pass the common sense test. Is it rational, for example, that a cigarette disclosed as “just as harmful” as Marlboro Reds would be determined by the market to be worth only 22.3% of the price of Marlboro Lights when such a product is the functional equivalent of Marlboro Reds? Similarly, is it tenable to assert that a cigarette would ever be valued (in a true market between buyer and seller) at 7.7% of the market price of the misrepresented Marlboro Lights?[11] I answer both questions “No.” That skepticism concerning the alleged damages is reinforced when the specifics of how plaintiffs got to the numbers are examined.
It is undisputed that Dr. Harris’ opinion with respect to actual damages rests for its validity on the survey conducted by Dr. Dennis. If the survey does not provide relevant and meaningful results, Dr. Harris’ opinion fails and plaintiffs’ proof of actual damages fails.
The survey relied upon by plaintiffs was conducted in 2002 by Dr. Dennis in connection with another Marlboro Lights case, Price v. Philip Morris, Inc. in Illinois (“the Price survey”). Dr. Dennis conducted an internet survey from a population of individuals who had agreed to be surveyed from time to time on a number of topics. The survey population was known as the Knowledge Network. The survey population was spread across the entire United States. The first step was to identify among the survey respondents those individuals who had smoked Marlboro Lights at any time in the year leading up to 2002. A total of 276 individuals were then qualified to respond to a series of questions posed over the internet. The survey did not include any communication other than the written set of questions and responses.
The survey asked participants to choose between the two versions of Marlboro Lights described above: Product 1 and Product 2. The survey told the respondents that the two products were “identical” in all ways except that Product 1 was “safer.” As would be expected, nearly all participants responded that he/she would choose the “safer” product. The participants were then asked whether they would purchase the product that was less safe at any price. If so, they were asked to specify the discount, in ten percent increments, that they would require in order to purchase the product that was less safe. The majority of respondents indicated that they would not choose the less safe product at any price. The remainder responded with their individual estimate of the discount they would require before purchasing the less safe product.
Philip Morris called as an expert witness Dr. Nancy A. Mathiowetz. Dr. Mathiowetz holds a Ph.D. in sociology from the University of Michigan. She has worked in the field of survey research for decades and has published numerous articles, book chapters and monographs regarding the principles for conducting reliable survey research. I find her testimony to be credible and persuasive.
Dr. Mathiowetz testified that the Price survey conducted by Dr. Dennis fails to provide meaningful and reliable information for this case for two principal reasons: (1) the sample missed the target population, and (2) the survey questions were confusing, ambiguous and biased. The first reason is the most compelling to me. The sample population was not the certified class, or a reasonable facsimile thereof. Of the 276 participants who completed the survey, only three lived in Massachusetts. The survey was taken in 2002, four years after the close of the class period. While Dr. Dennis testified that in his opinion the survey results could be projected to be the same for a Massachusetts sample during the class period, his basis for that opinion was speculative.
Dr. Mathiowetz, on the other hand, demonstrated the importance of selecting the right sample in order to obtain valid survey results. She pointed to significant differences between a Massachusetts population and a nationwide population in terms of what the populations were exposed to regarding smoking, in general, and smoking light cigarettes, in particular. Massachusetts smokers were exposed to a large-scale media campaign starting in the mid- 1990s initiated by the Massachusetts Tobacco Control Program. The campaign emphasized that light cigarettes were no safer than regular, full flavor brands and explained the phenomenon of compensation. Dr. Mathiowetz also relied upon a published study in 2000, based on data collected in 1998, showing that Massachusetts smokers held significantly different perceptions about light cigarettes than those held by smokers from around the nation. Finally, the evidence showed that in the period from the end of the class period to 2002 (when the survey was done) there were significant developments in the public health community at large regarding the dangers of smoking light cigarettes. For example, the well-publicized Monograph 13 from the National Cancer Institute came out in 2001.
In sum, plaintiffs elected to use the Price survey rather than conduct their own survey corresponding to the geography and time period defining the class certified in this action.[12] Dr. Mathiowetz testified that *320 the choice by Dr. Dennis to project to this certified class the results of his 2002 nationwide survey in the Price litigation violated a fundamental principle for the reliability of survey research as set forth in the Reference Manual on Scientific Evidence published by the Federal Judicial Center. The manual states that, “A survey that provides information about a wholly irrelevant population is itself irrelevant.” The manual suggests that the court ask, “Did the Sampling Frame Approximate the Population?” Dr. Mathiowetz answered that question “no” and I agree.
Dr. Mathiowetz also pointed out that the survey questions in the Price survey were confusing, ambiguous and biased. In her opinion, this was in violation of the principle implied in the following question from the Reference Manual on Scientific Evidence “Were Questions on the Survey Framed to Be Clear, Precise, and Unbiased?” Dr. Mathiowetz detailed how the questions tested for a higher reading skill level than what is acceptable for survey practice and how the questions introduced “acquiescence bias” and “status quo bias.” The evidence also showed that a number of respondents indicated in the “Comments” section of the survey that it “was the worst survey I have ever seen,” “tricky,” “poorly stated,” “hard to understand,” “exceptionally confusing,” and “the most ridiculous survey that I have ever been asked to complete.” I accept Dr. Mathiowetz’s criticisms of the Price survey questions and conclude that even if the survey had been of the correct population the results produced from these questions would be less than persuasive.
Having rejected the survey result from the Price survey and Dr. Dennis’ attempt to project those results to the Massachusetts certified class in this case, the calculation of actual damages by Dr. Harris has no foundation. I could stop here. Plaintiffs failed to prove to a reasonable certainty a specific amount of actual damages. I will, nevertheless, comment on the flaws that I see in the methodology used by Dr. Harris to compute actual damages.
Dr. Harris attempted to value a hypothetical product during the class period—Marlboro Lights with full disclosure that the cigarettes are just as harmful or potentially more harmful than Marlboro Reds (Product 2). Because Product 2 did not exist in the class period Dr. Harris did not have objective data about the market price of Product 2. He could not, for example, compare the price of a product that carried a particular representation (shampoo that cures dandruff) with the true market established price of a product without that representation (regular shampoo) to see how much a fraudulent seller of dandruff shampoo that was, in fact, not a dandruff shampoo, had overcharged its customers. He therefore constructed a model to determine a contingent valuation of Marlboro Lights with full disclosure. The model demonstrated the common sense conclusion that consumers would either not buy or would pay less for the fully disclosed “just as harmful” or “could be more harmful” Marlboro Lights. But the model becomes entirely subjective when it attempts to peg a specific amount consumers would be willing to pay for the fully disclosed Marlboro Lights (Product 2). The actual answers to that question ranged from zero dollars to one hundred percent of the price of Marlboro Reds. In other words, the answers showed that various members of the surveyed sample would have a different opinion as to how much they were damaged under the benefit of the bargain rule for calculation of damages. Dr. Harris then took the average of the survey respondents’ subjective answers to how much they would be willing to pay for the fully disclosed Marlboro Lights and opined that the average of those subjective judgments is proof of the true market value of the hypothetical Marlboro Lights with full disclosure during the class period.[13] That methodology is flawed. The use of an average simply attempts to convert an inability to prove a specific, objective amount of actual damages to proof based upon a range of subjective opinions.[14]
As discussed previously, in order to recover under c. 93A, a plaintiff must prove a deceptive act and that he suffered an injury caused by that act. With respect to a class action under §9(2) of c. 93A, it must be shown that the class members suffered a “similar injury.” Based on the compelling inference that purchasers of Marlboro Lights during the class period received a product whose true market value was less than what they paid for it, I concluded that the class representative and the class members were injured as a result of the deceptive conduct of Philip Morris. The amount of that injury, however, is subject to proof. And where the proof depends upon a wholly subjective measure, it fails to establish an amount of actual damages. I find that plaintiffs have failed to carry their burden of proving an amount of actual damages.
As an alternative measure, plaintiffs seek an award of the pretax profits earned by Philip Morris by the sale of Marlboro Lights in Massachusetts during the class period. The parties stipulated to the amount: $68,762,000.
This court (Kaplan, J.) previously ruled that plaintiffs could not recover the pretax profits of Philip Morris as an equitable remedy of disgorgement. As-pinall—Remedies Decision at *24 [32 Mass. L. Rptr. 75). I indicated to plaintiffs that I agreed with that conclusion. Plaintiffs now offer a different approach. They say they seek to recover Philip Morris’ pretax profits as an alternative measure of “actual damages.”
The new approach does not aid the plaintiffs for two reasons. First, the Supreme Judicial Court already determined that the “appropriate” measure of actual damages in this case is the benefit of the bargain model, as described above. Aspinall I at 399.[15] Second, while under certain circumstances an award of a defendant’s profits may be appropriate as a measure of actual damages, those instances are limited to *321 where the defendant’s profits are a reasonable approximation of plaintiffs’ injury. See, e.g., Tyler, 464 Mass. at 504 n.20 (2013) (disgorgement of the merchant’s profits may provide an appropriate means of calculating damages because it is a close approximation of the injuiy to the plaintiff); Kelley v. CVS Pharmacy, Inc., 2007 Mass.Super. LEXIS 381 (Mass.Super.Ct. 2007) (Gants, J.) [23 Mass. L. Rptr. 87] (where actual damages were less than the $25 statutory damage amount, defendant’s profits approximate the iniury to the plaintiff).
Here, Philip Morris’ pretax profits do not serve as a measure of plaintiffs’ injury. As described above, the injuiy is that plaintiffs paid too much for the deceptive Marlboro Lights. In contrast, a damage award of all of Philip Morris’ profits suggests that, absent the fraud, no class members would have purchased Marlboro Lights or that members of the class received no benefit at all from the product. The evidence does not support either of those assumptions. The total of all of Philip Morris’ profits does not serve as a reasonable and non-speculative estimate of the class members’ injuiy. Thus, actual damages based upon Philip Morris’ pretax profits are rejected.
II. Recoveiy of Statutoiy Damages
“In the event that the plaintiffs are unsuccessful in their attempt to prove actual damages . . . they will be entitled to recover statutoiy damages under G.L.c. 93A, §9(3) . . .” Aspinall I at 400. This is true because all members of the class, regardless of their individual knowledge or smoking habits, paid a higher amount for Marlboro Lights than what they would have paid in a true, efficient market for the fully disclosed Marlboro Lights. Under §9(3), “if the court finds for the petitioner, recoveiy shall be in the amount of actual damages or twenty-five dollars, whichever is greater . . .” As already determined by this court (Kaplan, J.),[16] the language of the statute mandates that the award of statutory damages, in lieu of actual damages, be made to each “petitioner” or in this case to each class member. The size of the class in this case is uncontested. Dr. Harris testified that based upon his calculation, using the court determined definition of the class, there are 197,700 members of the class. Accordingly, statutoiy damages in the amount of $4,942,500 (197,700 multiplied by $25) shall be awarded to plaintiffs.[17]
III. Multiple Damages Under c. 93A, §9(3)
Section 9(3) of c. 93A provides that “if the court finds for the petitioner, recoveiy shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two . . .’’As discussed above, I have found that Philip Morris’ deceptive acts and practices persisted through the class period and that such acts and practices were willful and knowing violations of c. 93A, §2. Consequently, if possible, I would treble the damage award of $4,942,500 based upon the statutory $25 per class member calculation of damages.
Unfortunately for plaintiffs, however, binding precedent bars trebling of these damages under the facts and circumstances of this case. In Leardi v. Brown, 394 Mass. 151, 162 (1985), the Court stated, “In circumstances where the plaintiff is entitled to treble damages under G.L.c. 93A, and where the actual damages, when trebled, are less than $25, then the plaintiff is entitled to the statutoiy amount of $25, instead of $75.” I have found that plaintiffs here failed to prove any specific amount of actual damages. While the class members suffered an injuiy of at least a penny as a result of purchasing Marlboro Lights cigarettes that were just as harmful or potentially more harmful than Marlboro Reds, I have no evidential basis for quantifying the actual damages of each class member. Accordingly, I cannot find that a class member’s actual damages, when trebled, would exceed $25. Given the mandate of Leardi, an award of multiple damages is denied.
CONCLUSION AND ORDER
For the reasons stated above, I find that Philip Morris’ acts and practices with respect to the marketing and sale of Marlboro Lights during the class period were willfully and knowingly deceptive in violation of c. 93A. Class members, individuals who purchased Marlboro Lights in Massachusetts during the class period, suffered a distinct economic injuiy caused by the deceptive acts; namely, they paid too much for the misrepresented cigarettes. Because plaintiffs could not prove with reasonable certainty a specific measure of the actual damages incurred by the class members as a result of the deception, I award damages of the statutory amount of $25 per class member, or a total of $4,942,500, plus prejudgment interest.
As the prevailing parly, the class is entitled to an award of reasonable attorneys fees and costs incurred in connection with this action pursuant to §9(4) of c. 93A. It is hereby ORDERED that plaintiffs’ serve, pursuant to Superior Court Rule 9A, a motion for attorneys fees and costs supported by detailed affidavits. Such motion shall be served by March 21, 2016. When the Rule 9A package is submitted to the court, the court will schedule oral argument. If either side desires an evidentiaiy hearing with respect to the award of fees and costs, the party should inform the court and describe why an evidentiaiy hearing is necessaiy.

 It is fair to conclude that Philip Morris, as the manufacturer, knew of the same published reports regarding the phenomenon of compensation completely mitigating the promise of lower tar and nicotine in Marlboro Lights. Yet, Philip Morris did not, throughout the class period, delete or modify or elucidate the implied message of “less harmful” provided by the descriptors on each and every pack of Marlboro Lights.

 Dr. Shields testified that the data in this study supported his opinion that there is no statistically significant difference in exposure to nicotine in Marlboro Lights smokers versus Marlboro Reds smokers.

 See c. 93A, §l(b) (defining “trade” and “commerce” as, “the advertising, the offering for sale, . . . the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed . . . and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth”).

 Under 940 Code Mass.Regs. §6.01, an “advertisement” is defined as: “[A]ny oral, written, graphic, or pictorial representation made by a seller in the course of the solicitation of retail business or which encourages a person to purchase a retail product. Advertisement includes a: representation made in a newspaper, magazine, on or via the Internet or other publication or on radio or television or contained in any notice, handbill, sign, billboard, banner, poster, display, circular, pamphlet, catalog, or letter, or printed on or contained in any tag or label which is attached to or accompanies any product offered for sale. Advertisement includes any representation disseminated within Massachusetts if the advertisement is directed to consumers in Massachusetts, or accessible to Massachusetts consumers on or via the Internet.”

 The amount of the reduced market value must be proved by plaintiffs to a reasonable certainty in order to recover actual damages. Aspinall I at 399. Plaintiffs’ proof will be addressed in the next section. The reduced market value may reasonably be inferred, however, to be “harm worth more than a penny” and, thus, is sufficient to establish compensable injury. Tyler, 464 Mass, at 504 n.20 (2013) (allowing recovery of statutory damages).

 Dr. Kevin M. Murphy, an expert economist called by Philip Morris, agreed that “the maximum amount [the consumer] would be willing to pay, whether he has to pay it or not, probably would be affected in some way” by learning that Marlboro Lights were just as harmful as Marlboro Reds.

 The fact that the price of Marlboro Lights never differed from the price of Marlboro Reds even after (1) the publication of Monograph 13 by the National Cancer Institute in 2001 (reflecting a scientific consensus that low tar and nicotine cigarettes are designed to allow compensatory smoking behaviors, offsetting much of the theoretical benefit of a reduced-yield cigarette), and (2) the disclosure by Philip Morris on its website and in onserts that Marlboro Lights are not “less harmful,” is unpersuasive to show that the Marlboro Lights with full disclosure had a true market value the same as the actual Marlboro Lights sold in the class period. Philip Morris’ focus on calculations of price, alone is misleading. Philip Morris’ expert, Dr Murphy, admitted that the price of Marlboro lights had never been set by competitive forces of supply and demand. The price was set by Philip Morris for strategic reasons having to do with competition among sellers in a highly concentrated oligopoly. In addition, Dr. Murphy agreed that at the time Monograph 13 was published, Marlboro Lights were being sold at the minimum price allowed under Massachusetts law so the price could not have been less as a result of full disclosure of risk. Moreover, Dr. Harris, plaintiffs’ expert economist, testified that, in fact, Marlboro Lights market share from 1990 to 2001 was on an upward curve but after 2001-2002 the market share leveled off and, by 2008, began to decline. The decrease in market share of Marlboro Lights, after disclosure, logically suggests that the price set by Philip Morris for the post-disclosure Marlboro Lights was too high.

 For example, a purchaser of dandruff shampoo may not be interested in dandruff prevention at all. He may simply like the texture of the anti-dandruff shampoo. The purchaser is, nevertheless, injured for purposes of damages under c. 93A by a false representation that the product is an anti-dandruff shampoo if he paid more for the product than he would have if the product had been sold as a regular shampoo with no anti-dandruff characteristic.

 Philip Morris did not contest the $660.1 million number for total sales in the class period.

 The discounts applied by Dr. Harris would result in the price of a pack of cigarettes being below the federal and state excise taxes levied on each pack of cigarettes and below the mandated minimum price for a pack of cigarettes under applicable Massachusetts regulations. Moreover, the discounted price would be below the cost of producing the cigarettes.

 Plaintiffs’ expert, Dr. Dennis, conducted state-specific surveys for Marlboro Lights litigation in Missouri and California.

 This “willingness to pay” methodology completely ignores the other side of the equation in determining price in a market economy: the seller’s willingness to sell. Stated another way, the contingent valuation model based upon willingness to pay is a measure of the demand for the cigarette, only.

 Another flaw in this methodology is that Dr. Harris used the responses of a majority of the participants who said they would simply not buy Marlboro Lights if accompanied with full disclosure that the cigarettes were just as harmful or could be more harmful than Marlboro Reds, to compute the average. Those respondents valued Product 2 as worth zero dollars. Thus, the average calculated by Dr. Harris to prove the true market value of the product was very substantially reduced by including the majority of respondents who, by their own response, would not be in the market for the product.

 The Supreme Judicial Court left open the issue of whether disgorgement of profits might be available as an equitable remedy, although it was “not aware of any Massachusetts decisions holding that plaintiffs in a successful class action under G.L.c. 93A suit may, or may not, be awarded equitable monetary damages . . .” Aspinall I at 384 n.5. Plaintiffs, however, now seek an award of defendant’s profits as a measure of actual damages as opposed to as an equitable remedy. The measure of actual damages is the benefit of the bargain model.

 Aspinall—Remedies Decision, at *25.

 Plaintiffs shall be entitled to prejudgment interest on the award of damages pursuant to G.L.c. 231, §6B. Mahan v. Hoekstra, 88 Mass.App.Ct. 1114; 2015 WL 7357231, at *3 n.5. (Nov. 23, 2015) (Rule 1:28 decision) (an award of statutory damages under c. 93A is properly characterized as compensatory and, thus, falls within the class of damages to which prejudgment interest applies). Prejudgment interest is at the rate of 12% from the date of the commencement of the action (November 1998). If judgment were entered at this time, prejudgment interest would be approximately 207% of the damages awarded.